Ronald C. **HATFIELD,** Appellant

v.

Glenn J. **SOLOMON,** Appellee.

No. 14–08–00487–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 3, 2010.

---

David M. Gunn, Michael O. Connelly, Houston, for appellant.

Paul J. Dobrowski, Jeffrey C. Alexander, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices YATES and BOYCE.

## OPINION ON REHEARING *

WILLIAM J. BOYCE, Justice.

Appellant Ronald C. Hatfield challenges the trial court's money judgment against him based on the jury's breach-of-contract findings in favor of appellee Glenn J. Solomon. In six issues, Hatfield asserts that the trial court erred in several respects in charging the jury, and that the trial court erred in awarding Solomon certain costs in the judgment. We conclude that the trial court did not err as alleged by Hatfield in charging the jury as to one of the breach-of-contract theories upon which the trial court rendered judgment. We conclude that, even if the trial court erred as alleged in charging the jury as to the other theories of recovery, any such error was not harmful. However, we conclude that the trial court erred by awarding Solomon $109,150.22 in costs. We modify the trial court's judgment to correct this error, and we affirm the trial court's judgment as modified.

## Background

Solomon works in the real estate business in Dallas, Texas. Solomon's father and Hatfield's wife are cousins, and Solomon and Hatfield have known each other for at least 25 years. Solomon and Hatfield met at a family gathering sometime during 1996 or 1997, where Hatfield mentioned that he had moved to Cabo San Lucas, Mexico to work on a real estate development there called "Villas del Mar." In connection with the Villas del Mar development, Hatfield worked for a company controlled by a Houston real estate developer. Solomon later visited Hatfield in Cabo and explored various opportunities for investing in real estate there.

The Villas del Mar project included the construction of luxury resort homes called "casitas." According to Solomon, Hatfield told him that Hatfield: (1) had an option to purchase a casita to be built on lot 11 (the "Casita") at a price significantly below the Casita's market value; and (2) wanted to sell the option to Solomon. Solomon testified that he paid Hatfield $150,000 for this option in late February or early March 1998. Hatfield never assigned an option to Solomon; Hatfield has asserted in this lawsuit that he did not have an option to buy the Casita during this time period.

Although Hatfield and Solomon dispute the statements they made to each other during this period and the basis of their business relationship, it is undisputed that (1) Hatfield received $150,000 from Solomon; and (2) Hatfield and Solomon did not enter into a written agreement with each other before April 16, 2001.

After Hatfield received the $150,000 from Solomon, the nature of the Villas del Mar development changed in various ways. The developers decided to make the casitas larger, and the company for which Hatfield worked decided that it wanted Hatfield to live in the Casita while Hatfield was overseeing and promoting the development. Solomon testified that Hatfield proposed in mid–1999 that Hatfield and Solomon acquire the Casita as partners.

---

* We deny appellee's motion for rehearing. The opinion issued in this case on March 11, 2010 is withdrawn, and this opinion on rehearing is issued in its place.

According to Solomon, Hatfield and Solomon discussed the possibility that significant tax savings could be realized under Mexican law when the Casita was sold to a third party if Hatfield lived in the Casita, worked in Mexico, and owned all of the beneficial interest[1] in the Casita. After various communications and negotiations between Hatfield and Solomon in 2000 and early 2001, Hatfield and Solomon signed a written agreement on April 16, 2001 (the "Agreement").

The Agreement consists of a promissory note signed by Hatfield ("Note"), with a letter agreement signed by Hatfield and Solomon attached as an exhibit to the Note and incorporated by reference into the Note ("Letter Agreement"). By the time the parties signed the Agreement, the Casita had been constructed and Hatfield was living in it. Hatfield unconditionally promised to pay Solomon $537,500 under the Agreement in two portions: the $150,000 portion and the $387,500 portion.

The $150,000 portion was payable in three installments of $25,000 and a final installment of $75,000, which was due on the fifth anniversary of the date of the Note unless "Conversion" had occurred before this date. If "Conversion" occurred before this date, the $75,000 would be paid out of the proceeds of the Casita's sale. Absent acceleration of the Note, the $387,500 portion was due on the fifth anniversary of the date of the Note unless "Conversion" had occurred before that date.

The parties defined "Conversion" to mean the conversion of the $387,500 portion into Solomon's "Net Profits Partnership Interest in the Casita" ("Net Profits Interest"). Under the Agreement, Hatfield expressly agreed to use his best efforts, in good faith, to acquire 100 percent of the beneficial interest in the Casita through a *fideicomiso* trust under Mexican law ("Acquisition") on or before October 13, 2001.[2] If Hatfield achieved Acquisition, he also was required to (1) pledge 100 percent of the beneficial interest in the Casita through a *fideicomiso* trust under Mexican law ("Beneficial Interest") to secure Hatfield's performance under the Agreement and record this pledge in the public registry as a first and prior lien on the Beneficial Interest; and (2) take all necessary steps before a Mexican "notario" so that the parties' rights and obligations under the Agreement are a part of the *fideicomiso* trust arrangement such that (a) the trustee of the *fideicomiso* trust and all third parties would be on notice thereof, and (b) any transfer of the Beneficial Interest would be conditioned on the performance by Hatfield of his obligations under the Agreement and Solomon's release of the lien on Hatfield's interest. In addition to taking the foregoing steps for perfecting the pledge of the Beneficial Interest (collectively referred to herein as "Lien Perfection"), Hatfield also was required to pay various costs, fees, and taxes associated with the Acquisition ("Closing Cost Payment"). Acquisition, Lien Perfec-

1. There was testimony at trial that individuals who are not Mexican citizens cannot hold title to coastal real estate under Mexican law but can own beneficial title through a *"fideicomiso* trust,*"* under which a Mexican bank holds legal title.

2. This date is 180 days after April 16, 2001. Under the Agreement, "Hatfield agrees to use his best efforts, in good faith, to acquire 100% beneficial interest in the Casita, on or before 180 days after **the date of this letter agreement,** pursuant to a *fideicomiso* trust arrangement under Mexican law." (emphasis added). Although Hatfield signed the Agreement on April 16, 2001, the top of the Letter Agreement bears the date "March 16, 2001." The jury charge and the parties designate April 16, 2001 as "the date of this letter agreement." Therefore, we do the same.

tion, and Closing Cost Payment all had to occur for the $387,500 portion to convert into Solomon's Net Profits Interest ("Conversion").

After Conversion, this Net Profits Interest would be paid to Solomon by distributing to him half of the amount remaining from the Casita's sale proceeds after subtracting certain items, including stipulated construction costs of $1,479,066. The Agreement did not require the Casita to be sold at any particular time. With the approval of Hatfield and Solomon, the Agreement allowed the Casita to be sold at any time. Under the Agreement, neither party had the right to sell the Casita before April 16, 2006, without the other party's approval. On or after April 16, 2006, the Agreement gave Solomon the ability, if he chose to do so, to compel Hatfield to put the Casita up for sale on the open market.

It is undisputed that Hatfield never achieved Acquisition. Solomon presented evidence that during the 180–day period from April 16, 2001 through October 13, 2001 (hereinafter "First Time Period"), Hatfield obtained an option to purchase the Beneficial Interest. Hatfield testified that he did not obtain such an option during the First Time Period. It is undisputed that Hatfield obtained such an option in July 2005, and that this option lasted through December 31, 2008. Hatfield obtained this option during the five-year period ending on April 16, 2006. It is undisputed that Hatfield had not exercised this option as of the time of trial in January 2008. Hatfield asserts that he had no duty after October 13, 2001, to make any effort to achieve Acquisition. Solomon asserts that Hatfield had a duty under the Agreement to use reasonable efforts to achieve Acquisition between October 13, 2001, and April 16, 2006 (hereinafter "Second Time Period").

Hatfield maintains he never agreed to be partners with Solomon unless and until a Conversion occurred under the Agreement. Because no Conversion occurred, Hatfield contends that no partnership was created. Solomon asserts that Hatfield owed a fiduciary duty to him because they were partners before they signed the Agreement and under the Agreement.

Hatfield tendered a check for $462,500 to Solomon in 2006, representing $387,500 plus $75,000. This is the amount Hatfield would owe under the Agreement five years after the date of the Note, absent a breach by Hatfield or Conversion of the $387,500 portion into Solomon's Net Profits Interest. Hatfield tendered this check in full satisfaction of all Hatfield's obligations under the Agreement. Solomon rejected the tender, and litigation ensued.

Solomon asserted claims against Hatfield for breach of contract, breach of fiduciary duty, and fraudulent inducement. Hatfield asserted claims against Solomon for breach of contract and declaratory judgment. The case went to trial; after ten trial days, the parties rested and the trial court prepared the jury charge. The trial court did not ask the jury to determine whether the parties formed a partnership or joint venture; instead, the trial court instructed the jury that the parties formed a type of partnership called a joint venture. The trial court also instructed the jury that a partner in a joint venture owes a fiduciary duty to its members and must fully and fairly disclose to them all material information concerning the joint venture's affairs.

The trial court submitted liability and damages questions on two different theories of recovery for breach of contract, and on breach of fiduciary duty and fraudulent inducement.

As to the first contract theory, the jury found that Hatfield failed to use his best efforts, in good faith, to achieve Acquisition during the First Time Period ("First Contract Theory"). As to the second contract theory, the jury found that Solomon and Hatfield intended that Hatfield would use "reasonable efforts" under the Agreement to achieve Acquisition during the Second Time Period, and that Hatfield did not do so ("Second Contract Theory"). In response to identical damage questions, the jury found the same damages for both contract theories of recovery. The jury also found liability and damages regarding Solomon's breach of fiduciary duty and fraudulent inducement claims. The jury assessed $462,500 in exemplary damages based on a finding the Hatfield engaged in malice, fraud, or gross negligence.

Solomon filed a motion for entry of judgment based on the jury's breach of contract findings. The parties agreed to try the attorney's fees issues to the bench; however, they stipulated to the amount of reasonable and necessary attorney's fees incurred by Solomon through trial. The trial court rendered judgment for Solomon as follows: $1,244,656 in actual damages for breach of contract; $167,691.56 in prejudgment interest on this amount from April 16, 2006 to the date of judgment; $515,000 in reasonable and necessary attorney's fees though trial, along with conditional awards of appellate attorney's fees; $109,150.22 for recovery of costs; and postjudgment interest.

### Analysis

In six appellate issues, Hatfield asserts that the trial court erred by: (1) instructing the jury that a partnership existed as a matter of law; (2) using the wrong date in the damages question for the First Contract Theory and by unfairly hiding the causation element in that question; (3)

asking the jury to interpret the Agreement because the Agreement is unambiguous, and even if the Agreement were ambiguous, by wording the ambiguity question improperly; (4) defining the duties of a fiduciary in Question 5; (5) charging the jury on malice, fraud, and gross negligence because there was no evidence of malice, fraud, or gross negligence; and (6) awarding certain litigation costs in the judgment because there is no evidence or jury finding to support recovery of these costs.

 A trial court must submit in its charge to the jury all questions, instructions, and definitions raised by the pleadings and evidence. *See* Tex.R. Civ. P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex.1999). A proper jury instruction (1) assists the jury, (2) is legally correct, and (3) finds support in the pleadings and evidence. *See Texas Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000). The goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *See Rodriguez*, 995 S.W.2d at 664. Toward that end, the trial court enjoys broad discretion so long as the charge is legally correct. *See id.* Appellate courts determine whether a challenged portion of the charge is legally correct using a de novo standard of review. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex.2003).

### I. The Theories of Recovery Upon Which the Trial Court Rendered Judgment

 Hatfield asserts on appeal that Solomon elected the First Contract Theory as the sole basis for the trial court's judgment, relying on the statements of Solomon's counsel at the February 21, 2008 hearing. Solomon contradicts this assertion in his appellate brief by asserting that he "elected to recover upon the breach of

contract findings...." The jury made two findings that Hatfield breached his contract, one finding as to the First Contract Theory and one finding as to the Second Contract Theory. By asserting that he elected to recover on the jury's two breach-of-contract findings, Solomon has contradicted Hatfield's assertion that Solomon only elected to recover upon the First Contract Theory. *See* Tex.R.App. P. 38.1(g). Before analyzing Hatfield's issues, we first identify the theories of recovery that served as the basis of the trial court's judgment in favor of Solomon.

In its judgment, the trial court did not unambiguously limit the basis of the judgment to the First Contract Theory. *See Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 422 (Tex.2000) (holding that language of unambiguous judgment must be enforced without consideration of extrinsic evidence as to its meaning). We presume for the sake of argument that the judgment is ambiguous as to whether it is based on the Second Contract Theory. Therefore, we focus on the judgment's language and consider the record and the context in which the trial court rendered the judgment. *See Lone Star Cement Corp. v. J. Roll Fair, District Judge,* 467 S.W.2d 402, 404–05 (Tex.1971).

In his motion for entry of judgment, Solomon stated that "[i]n this case, the judgment that the Court should enter should be based on the jury's breach of contract findings." Solomon did not seek judgment based on his tort claims. Solomon outlined the contract damages that he argued should be awarded in the judgment; however, the damages recoverable under Solomon's two contract theories of recovery are the same. Solomon provided the trial court with a proposed judgment under which Solomon would recover these damages. In his motion and proposed judgment, Solomon did not limit the basis

for his requested judgment to the First Contract Theory.

On February 21, 2008, the trial court held a hearing on various post-verdict motions. At this hearing, the trial court denied Hatfield's motion for judgment notwithstanding the verdict and heard argument regarding various issues relating to rendition of judgment. At one point, Solomon's counsel stated that Solomon was electing to recover under breach of contract, which would indicate recovery under both theories; however, Solomon's counsel made other statements that seemed to limit Solomon's election to only the First Contract Theory. The trial court rejected Hatfield's contention that, in calculating Solomon's actual damages, a deduction should be made for Mexican taxes, and counsel discussed how they had otherwise stipulated to the amount of the deductions to be made in calculating the amount of Solomon's actual damages as well as the amount of reasonable attorney's fees to be awarded Solomon through trial. The trial court also determined that it would calculate prejudgment interest based on a 7.25 percent interest rate rather than an 18 percent interest rate. The trial court further concluded that Solomon was entitled to recover $109,150.22 in costs under the Agreement. The trial court did not render judgment on February 21, 2008.

On February 28, 2008, the parties submitted a proposed judgment to the trial court, the form of which was approved by the parties. There was a brief hearing before the trial court signed this judgment; however, no mention was made during this hearing regarding the theories upon which the judgment was based. The trial court then signed its final judgment. In this judgment, the trial court incorporates the jury's verdict, renders judgment on the verdict, and grants Solomon a con-

tract recovery against Hatfield. In the judgment, the trial court does not limit Solomon's recovery to the First Contract Theory, nor does the court state that judgment is based on both contract theories.

In response to Hatfield's motion for new trial, Solomon indicated that the trial court's judgment was based on both contract theories. Solomon stated that "Solomon elected to recover his damages under the breach of contract findings and the Court entered judgment accordingly. Hence, the jury's findings regarding breach of fiduciary duty and fraud are moot."

■ When a party receives favorable jury findings on two or more theories of recovery that yield different damage amounts, that party may elect the measure of damage upon which the party wishes to recover. See Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 367 (Tex. 1987). Double recovery for a single injury is not permitted; if the prevailing party fails to make such an election, then the trial court should utilize the findings affording the prevailing party the greater recovery and render judgment accordingly. See id. However, if a party receives favorable findings on two or more theories of recovery that are consistent with each other and result in the same damages, then the trial court may render judgment awarding a single recovery of these damages and this judgment may be based on all of these theories. See Texas & N. O. R.R. Co. v. McGinnis, 130 Tex. 338, 109 S.W.2d 160, 162–63 (1937) (rejecting defendant's contention that trial court's judgment was based on only common-law negligence and affirming judgment based on plaintiff's claim under Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 ("FELA"), in case in which jury made findings favorable to plaintiff on his common-law negligence claim and on his FELA claim, and in which damages were the same under both claims); Owens–Corning Fiberglas Corp. v. Martin, 942 S.W.2d 712, 715, 722–23 (Tex.App.-Dallas 1997, no writ) (affirming trial court's judgment based on products-liability claim despite error in the charge as to the negligence claim, in case in which the judgment was based on both claims and the damage awards were the same for both claims).

While the colloquy among the trial court and the parties one week before rendition of judgment may have indicated that Solomon was electing to recover only under the First Contract Theory, this is not dispositive of the meaning of the language in the judgment rendered by the trial court one week later. See Gulf States Utilities Co. v. Low, 79 S.W.3d 561, 564–65 (Tex.2002).

In Gulf States Utilities Co., the Supreme Court of Texas sought to determine the basis for the trial court's judgment when the judgment did not specify the theory on which it was based. See id. The Supreme Court indicated that, if the judgment awarded the amount of damages corresponding to a theory of recovery, then the court would construe the judgment as being based on that theory of recovery. See id. at 565. Here, the trial court awarded Solomon the exact amount of damages that he would recover under either contract theory of recovery, and the trial court did not exclude the Second Contract Theory as a basis for the judgment. Because the damages recoverable under the two contract theories are identical and because the trial court awarded a single recovery of these damages, Solomon was not required to elect between these two theories of recovery. See Birchfield, 747 S.W.2d at 367; McGinnis, 109 S.W.2d at 162–63; Owens–Corning Fiberglas Corp., 942 S.W.2d at 722–23. After reviewing the language of the judgment and the record, we conclude that the trial court rendered

judgment based on both contract theories of recovery.[3]

## II. Ambiguity of the Agreement

█ Hatfield asserts in his third issue that, under the unambiguous language of the Agreement, he had no duty to make any effort to achieve Acquisition after October 13, 2001. If Hatfield is correct, then the trial court erred in determining that the Agreement was ambiguous and in asking the jury to determine whether the parties intended that Hatfield had a duty under the Agreement to use reasonable efforts to achieve Acquisition during the Second Time Period.

█ Whether a contract is ambiguous is itself a question of law. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous and it can be construed as a matter of law. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). If its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed, then it is ambiguous and its meaning must be resolved by the finder of fact. *See id.* In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the written instrument. *See id.* This court need not embrace strained rules of construction that would avoid ambiguity at all costs. *See id.*

The issue here is not whether a court may imply a covenant by Hatfield to use reasonable efforts to achieve Acquisition during the Second Time Period. *See HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 888–89 (Tex.1998) (stating that courts can imply a covenant if "it appears from the express terms of the contract that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore they omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument") (quotations omitted). Instead, the issue is whether the Agreement is ambiguous as to whether the parties agreed that Hatfield had a contractual duty to use reasonable efforts to achieve Acquisition during the Second Time Period.

Hatfield expressly agreed under the Agreement to use his best efforts, in good faith, to achieve Acquisition on or before October 13, 2001. If he acquired the Beneficial Interest, Hatfield also agreed to obtain Lien Perfection and Closing Cost Payment. After Acquisition, Lien Perfection, and Closing Cost Payment, the $387,500 portion of the Note would convert into a Net Profits Interest. If this Conversion did not occur prior to April 16, 2006, Solomon agreed he would have no Net Profits Interest, and Hatfield would instead owe Solomon $537,500 under the Note—$387,500 plus the final $75,000 installment from the $150,000 portion. Hatfield did not agree to use his best efforts to achieve Lien Perfection and Closing Cost Payment; rather, if Hatfield achieved Acquisition, he agreed to achieve Lien Perfection and Closing Cost Payment.

---

3. Even if the Second Contract Theory did not provide a basis for the trial court's judgment, this court would still be able to address this theory as a basis for affirming the trial court's judgment on original submission because the parties have briefed this theory on appeal. *See Beal Bank, S.S.B. v. Schleider,* 124 S.W.3d 640, 650, n. 4 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

Hatfield asserts that the only reasonable interpretation of the Agreement is that Hatfield had no duty to make any effort to achieve Acquisition after October 13, 2001. Hatfield argues that stating such a duty in the Agreement would have been easy, yet the parties did not expressly address in the Agreement what efforts, if any, Hatfield was required to make to achieve Acquisition during the Second Time Period. Hatfield notes that at no point in the Agreement does Hatfield expressly agree to use *reasonable* efforts to do anything.

Solomon argues that, while the Agreement does not contain an express covenant obligating Hatfield to pursue Acquisition during the Second Time Period, the Agreement also lacks language stating that Hatfield has no duty to pursue Acquisition during the Second Time Period. In support of his interpretation, Solomon notes that the parties state in several parts of the Agreement that Conversion can occur up until the end of the Second Time Period. In response, Hatfield asserts that, though the parties agreed that Conversion could occur up until the end of the Second Time Period, this Agreement does not show that Hatfield had any duty to seek Acquisition during the Second Time Period. Instead, Hatfield asserts that the Agreement allowed him to achieve Lien Perfection at any time during the Second Time Period.

We conclude that Hatfield's alternative interpretation of the Agreement is reasonable. Conversion occurs upon the satisfaction of three conditions—Acquisition, Lien Perfection, and Closing Cost Payment. The Agreement expressly states that Conversion can occur up until the end of the Second Time Period. Therefore, under the express language of the Agreement, Acquisition can occur during the Second Time Period, after the expiration of Hatfield's duty to use his best efforts, in good faith, to achieve Acquisition. It might be reasonable to construe the Agreement as contemplating only the possibility that Hatfield would achieve Acquisition during the Second Time Period even though he had no contractual duty to do so. However, it is also reasonable to construe the Agreement as imposing on Hatfield a duty to use reasonable efforts to achieve Acquisition during the Second Time Period, because the parties would not expect Hatfield to achieve Acquisition during this period absent a contractual duty to do so. We conclude it is reasonable to interpret the Agreement to impose on Hatfield a duty to use reasonable efforts to achieve Acquisition during the Second Time Period. Because there are two reasonable interpretations, the Agreement is ambiguous. *See Lenape Res. Corp.*, 925 S.W.2d at 574 (contract provision was ambiguous); *Exxon Corp. v. West Texas Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993) (contract was ambiguous based on two reasonable interpretations of an issue not specifically addressed in the contract); *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983) (contract language was unclear and ambiguous). Therefore, the trial court did not err in concluding that the Agreement was ambiguous and in asking the jury to determine whether the parties intended that, during the Second Time Period, Hatfield had a duty under the Agreement to use reasonable efforts to achieve Acquisition.[4]

## III. The Form of Question 2 in the Jury Charge

■ Hatfield also asserts in his third issue that, even if the Agreement were

---

4. Hatfield has not challenged the sufficiency of the evidence supporting the jury's finding that the parties to the Agreement intended to impose on Hatfield a duty to use reasonable efforts to achieve Acquisition during the Second Time Period.

ambiguous, the trial court erred by wording the ambiguity question improperly. Specifically, Hatfield asserts that the trial court erred by overruling his objection that Question 2 should be structured in accordance with Texas Pattern Jury Charge 101.8 ("PJC 101.8"). *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* 42–43 (2008 ed.). Unlike the format suggested in PJC 101.8, Question 2 does not quote any ambiguous language from the Agreement and does not instruct the jury to interpret this language. *See id.*

■ The trial court enjoys wide discretion in framing a jury charge and is given broad latitude to determine the propriety of explanatory instructions and definitions. *See H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex.1998). The trial court asked the jury to determine whether the parties intended that Hatfield would use "reasonable efforts" under the Agreement to achieve Acquisition during the Second Time Period. The trial court instructed the jury that it had to determine the parties' intent at the time of the Agreement, considering all of the facts and circumstances surrounding the making of the Agreement, the interpretation placed on the Agreement by the parties, and the parties' conduct. Though the trial court does not have discretion to submit a legally incorrect charge, we conclude that the trial court's failure to include an instruction similar to PJC 101.8 does not make Question 2 legally incorrect. *See Rodriguez*, 995 S.W.2d at 663–64 (trial court enjoys broad discretion in framing the jury charge so long as the charge is legally correct); *Exxon Corp.*, 868 S.W.2d at 302, n. 3 (ordinarily, the better method for submitting a question of ambiguity in a contract to the jury is to follow PJC 101.8; but following PJC 101.8 is not mandatory

as a matter of law). We conclude that the trial court did not abuse its discretion by failing to include the instruction from PJC 101.8 in Question 2. *See H.E. Butt Grocery Co.*, 985 S.W.2d at 23–25 (trial court did not abuse its discretion in formulating the jury charge).

Having found that both of Hatfield's complaints in his third issue lack merit, we overrule Hatfield's third issue.

## IV. Harm Analysis Regarding Alleged Error in Instructing Jury on Partnership

■ In his first issue, Hatfield asserts that the trial court erred by instructing the jury as a matter of law that a partnership existed between the parties rather than asking the jury to determine whether a partnership existed. We presume for the sake of argument that the trial court erred in instructing the jury that Hatfield and Solomon had formed a partnership and owed fiduciary duties to one another. We presume that the trial court should have submitted the issue of partnership formation to the jury. In determining whether this charge error was harmful, we examine the entire record and determine whether the charge error probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex.2001).

Hatfield asserts that the parties hotly contested whether there was a partnership between Hatfield and Solomon; Hatfield and his counsel told the jury there was no partnership, and Solomon and his counsel told the jury there was. By instructing the jury as a matter of law that there was a partnership, Hatfield asserts that the trial court effectively told the jury that Hatfield was a liar. Hatfield notes that the parties emphasized the partnership issues during the trial. Hatfield asserts

that Solomon's counsel emphasized the erroneous partnership instruction by telling the jury at the beginning of his closing argument that, though Hatfield testified he did not have a partnership with Solomon and did not owe him a fiduciary duty, the trial court instructed the jury to the contrary in the charge.

The issue of whether a partnership existed may have been a hotly contested issue at trial; however, that issue did not impact Solomon's Second Contract Theory. As to that theory, the jury was asked only to determine (1) whether the parties intended Hatfield to have a duty to use reasonable efforts to achieve Acquisition during the Second Time Period, (2) whether Hatfield breached this duty, and (3) the fair market value of the Casita to be used to determine Solomon's damages resulting from this breach. These questions and any answers to them were not affected by the existence of a partnership or the existence of a fiduciary duty owed by Hatfield to Solomon.

■■■■ Error in the submission of an issue generally is deemed to be harmless when the findings of the jury in answer to other issues are sufficient to support the judgment. *See Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 750 (Tex.1980); *McGinnis,* 109 S.W.2d at 162–63. An exception to this rule exists when the charge error confuses or misleads the jury as to all of the issues or theories that are sufficient to support the judgment. *See Boatland of Houston, Inc.,* 609 S.W.2d at 750.

Presuming that the partnership instruction was erroneous, it would affect the questions regarding the breach of fiduciary duty claim and perhaps the fraudulent inducement claim; however, Solomon did not elect recovery on these claims, and they are not the basis for the trial court's judgment. We conclude that this error would not confuse or mislead the jury regarding

the Second Contract Theory, which was a basis for the trial court's judgment. After carefully reviewing the entire record, we conclude that, even if the partnership instruction was erroneous, this error did not probably cause the rendition of an improper judgment. *See Boatland of Houston, Inc.,* 609 S.W.2d at 750 (even if the trial court erred in submitting three products liability defenses, these errors would not affect the determination of whether the product was defective, and the jury's negative answer to this question rendered any error regarding the defenses harmless); *McGinnis,* 109 S.W.2d at 162–63 (any charge error regarding plaintiff's common-law negligence claim was harmless because judgment was also based on plaintiff's FELA claim and the alleged error did not affect the questions regarding the FELA claim); *Owens–Corning Fiberglas Corp.,* 942 S.W.2d at 715, 722–23 (charge error regarding plaintiff's negligence claim was harmless because judgment was also based on a products-liability claim that was not affected by the error in the charge regarding the negligence claim).

Hatfield contends that the erroneous partnership instruction tainted the entire jury charge, causing the jury to find in favor of Solomon on all of his theories of recovery. Hatfield argues that the main issue at trial was whether the jury would find Solomon or Hatfield more credible and that the trial court's erroneous instruction destroyed Hatfield's credibility with the jury. Hatfield cites no precedent that supports such a harm analysis. Hatfield cites various cases involving harmful charge error, but in those cases, the error in the charge affected the theory or theories of recovery that were the basis of the trial court's judgment. Hatfield also relies on a statement from a concurring opinion in the Supreme Court of Texas. *See Ford Motor Co. v. Miles,* 967 S.W.2d 377, 378,

387 (Tex.1998) (Owen, J., concurring) ("The instruction tainted all the findings of the jury in what was a closely contested case."). In that case, the error was in the charge's definitions of "proximate cause" and "producing cause," resulting in an erroneous definition of an essential element of all six liability theories submitted to the jury. *See id.* at 385. Therefore, the taint of which Justice Owen spoke resulted from error in a definition used in all of the liability theories; Justice Owen did not conclude that error in an instruction as to one theory infected all of the other theories, even though the erroneous instruction did not pertain to those theories. *See id.* at 385–87.

For the reasons stated above, we conclude that, even if the trial court erred in instructing the jury as a matter of law that a partnership existed rather than asking the jury to determine whether a partnership existed, this error did not probably cause the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a); *See Boatland of Houston, Inc.*, 609 S.W.2d at 750; *McGinnis*, 109 S.W.2d at 162–63; *Owens–Corning Fiberglas Corp.*, 942 S.W.2d at 715, 722–23. Accordingly, we overrule Hatfield's first issue.

## V. Alleged Charge Error in Damage Question for the Second Contract Theory

■ The damage question for the Second Contract Theory (Question 4) was the same as the damage question for the First Contract Theory (Question 1A). On appeal, Hatfield argues that both of these questions have the same errors. Hatfield argues that the damage questions are confusing and unfairly hide the causation ele-

ment. Hatfield asserts that the damage questions appear to ask the jury to determine the market value of the Casita without requiring a finding that damages resulted from Hatfield's breach of contract. Hatfield preserved this complaint during the charge conference.

If the jury found that Hatfield failed to use reasonable efforts to acquire the Beneficial Interest during the Second Time Period, then the trial court instructed the jury to answer the following question:

*JURY QUESTION 4*

Find the market value of the Casita on the following dates, which, when applied to calculate Mr. Solomon's 50% net profits interest, would fairly and reasonably compensate Mr. Solomon for his damages, if any, that resulted from Mr. Hatfield's failure to comply?

You are instructed that, at the time of any judgment, the Court will deduct from the market value found by the jury, the construction costs, sales commission, and fixed amount [sic] to repay Mr. Solomon, in order to calculate the amount, if any, of the 50% net profits interest.

In arriving at the fair market value, you are instructed to not consider Mexican taxes which might be payable at the time of any sale, if any, or which might be owed by either party in Mexico or the United States.

Answer in dollars and cents, if any, for each the [sic] following dates.

A. April 16, 2006

---

5. Question 4 also asked the jury to determine the market value of the Casita as of January 2008, the time of trial. At oral argument, Solomon's counsel stated that this date was inadvertently included in Question 4, and that the valuation date on which Solomon bases his damage model for his contract claims is April 16, 2006.

■ Presuming that Hatfield breached a contractual duty to use reasonable efforts to seek Acquisition during the Second Time Period, the only damages Solomon can recover under the Second Contract Theory are those caused by this breach. *See Clearview Properties, L.P. v. Property Texas SC One Corp.*, 287 S.W.3d 132, 139–40 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). We presume for the purposes of our analysis that the evidence raised a fact issue as to whether this alleged breach caused Solomon not to obtain a Net Profits Interest that he otherwise would have received. While Question 4 could have been worded more clearly, we conclude that Question 4 sufficiently submitted the causation issue to the jury. This is reflected by the fact that Hatfield's counsel argued during closing that the jury could answer "zero" to the damages questions if the jury determined that any breach by Hatfield did not deprive Solomon of a Net Profits Interest. Therefore, we conclude that the trial court's charge did not unfairly hide the causation issue.

Hatfield also asserts that the damage question for the Second Contract Theory measures market value on the wrong date. He asserts that damages should be measured on the date of breach, which he asserts is the last date of the relevant time period for the contractual duty that was breached. Presuming that Hatfield's argument is correct, damages under the First Contract Theory should have been measured on October 13, 2001, at the end of the First Time Period, and damages under the Second Contract Theory should have been measured on April 16, 2006, at the end of the Second Time Period. We presume for the sake of argument that Hatfield preserved error regarding his wrong date argument. The wrong date argument, if correct, would mean that there is charge error as to the First Contract Theory because the date submitted in the damage question was April 16, 2006, rather than October 13, 2001. However, the wrong date argument, even if correct, does not show error as to the Second Contract Theory because the trial court measured damages as of April 16, 2006 in Question 4, which is the date yielded under Hatfield's argument.

For the reasons stated above, we find no merit in Hatfield's arguments as to why the trial court allegedly erred in charging the jury regarding the damage question for the Second Contract Theory.

## VI. Harm Analysis Regarding Alleged Error as to Other Claims

■ Hatfield asserts charge error in his second issue regarding Question 1A, the damage question for the First Contract Theory. In his fourth issue, Hatfield asserts charge error regarding the questions for the breach of fiduciary duty claim. In his fifth issue, Hatfield asserts that the trial court erred in submitting the punitive damage liability question based on the breach of fiduciary duty finding. Hatfield also asserts charge error regarding the questions for the fraudulent inducement claim. We already have rejected all of Hatfield's arguments regarding the Second Contract Theory.

We presume for the sake of argument that the trial court erred as asserted by Hatfield. However, even if the trial court erred in these matters, these errors do not relate to the Second Contract Theory and they would not confuse or mislead the jury regarding this theory, which was a basis for the trial court's judgment. After carefully reviewing the entire record, we conclude that, even if the jury charge contained these errors, they did not probably cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a); *See Boatland of Houston, Inc.*, 609 S.W.2d at 750;

*McGinnis,* 109 S.W.2d at 162–63; *Owens–Corning Fiberglas Corp.,* 942 S.W.2d at 715, 722–23. Accordingly, we overrule Hatfield's second, fourth, and fifth issues.

## VII. The Trial Court's Award of Costs

In his sixth issue, Hatfield challenges the trial court's award of $109,150.22 in costs to Solomon in the judgment. Although these costs are not taxable court costs, Solomon asserts that he is entitled to recover these types of costs under the terms of the Agreement, and we presume for the sake of argument that Solomon is correct. Nonetheless, there was no order or agreement between the parties that the issue regarding Solomon's entitlement to recover these costs would be tried separately. At trial, there was no evidence of the amount of these costs. Solomon did not seek any finding as to the amount of these costs, and this issue was not submitted in the jury charge.

In a post-trial motion seeking judgment on the jury verdict, Solomon raised the issue of his entitlement to these costs. At a hearing on February 21, 2008, Solomon proffered exhibits purporting to prove the amounts of these costs, which the trial court "admitted for the purposes of this post-verdict proceeding." The trial court did not re-open the evidence to make these exhibits part of the trial evidence. Hatfield contested Solomon's right to recover these costs, arguing that Solomon was seeking to recover these non-taxable costs under the Agreement; that the parties did not agree to try this issue separately; and that Solomon had not proved up these costs in the jury trial.[6] The trial court ruled that Solomon could recover these costs under the Agreement and awarded them in its judgment.

On appeal, Solomon asserts that the trial court had the authority to award these non-taxable costs to Solomon under Rules 131 and 141 of the Texas Rules of Civil Procedure. *See* Tex.R. Civ. P. 131, 141. Solomon asserts that, under Rule 141, a trial court may award non-taxable costs to a party for good cause. Before addressing this argument, it is helpful to look at the rules regarding taxable court costs.

Texas statutes and common law delineate which items the court may and may not include as taxable costs. *Sterling Bank v. Willard M, L.L.C.,* 221 S.W.3d 121, 124 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Rule 131 provides that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except when otherwise provided." Tex.R. Civ. P. 131. "Costs" usually refers to fees and charges required by law to be paid to the courts or some of their officers, the amount of which is fixed by statute or the court's rules, for example filing and service fees. *See Sterling Bank,* 221 S.W.3d at 125. Costs within the meaning of Rules 125 through 149 are those items in the clerk's bill of costs. *See id.; see also* Tex.R. Civ. P. 125–49. The allocation of costs is a matter for the trial court's discretion and cannot be overturned on

---

**6.** In his response in opposition to Solomon's motion for entry of judgment, Hatfield also asserted two arguments as to why these costs are not recoverable under the Agreement. At the February 21, 2008 hearing, Hatfield's counsel agreed with the trial court's statement that Hatfield was not contesting the amount of these costs. In light of Hatfield's objections to Solomon's recovery of these costs, this statement means that Hatfield was not asserting that Solomon should recover some other amount of non-taxable costs; Hatfield nonetheless asserted that Solomon could not recover these costs at all, either because the Agreement does not afford this recovery or because of Solomon's failure to prove up his right to recover these costs during the jury trial.

appeal absent an abuse of discretion. *See Sterling Bank,* 221 S.W.3d at 125.

Under Rule 141, the trial court has discretion, for good cause stated on the record, to allocate costs otherwise than as provided by law or the Texas Rules of Civil Procedure. *See* Tex.R. Civ. P. 141. Therefore, the trial court has the power to tax costs contrary to the applicable default rule—for example, to a party who is not the "successful party" under Rule 131. *See Sterling Bank,* 221 S.W.3d at 125. However, this power to allocate costs in a manner different from the norm does not encompass the power to tax as costs items that are not normally allowed as taxable court costs. *See id.* Generally, expenses incurred in prosecuting or defending a lawsuit are not recoverable as costs in Texas, unless permitted by a statute or equitable principle. *See id.* Under the Texas Civil Practice and Remedies Code, a party may recover fees of the clerk and service fees due to the court, court reporter fees for the original of stenographic transcripts, and such other costs and fees permitted to be awarded by other rules and statutes. *See* Tex. Civ. Prac. & Rem. Code Ann. § 31.007(b) (Vernon 2008).

The trial court did not award Solomon taxable court costs based on the district clerk's bill of costs. Rather than awarding Solomon taxable court costs under Texas Rules of Civil Procedure 125 through 149, the trial court awarded Solomon the costs in question under the Agreement. In this context, the trial court's assessment of these costs cannot be justified based on the trial court's discretion under Rule 141 to allocate taxable costs in a manner dif-

ferent from the norm. *See Sterling Bank,* 221 S.W.3d at 125. Contrary to Solomon's argument, Rule 141 does not give the trial court discretion to assess as costs items that are not within the scope of taxable court costs under Texas statutes, rules, and common law.[7] *See id.* Although Solomon can seek recovery of the costs in question as damages under the Agreement, Solomon cannot recover these items as taxable court costs. *See id.; Flint & Associates v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 626–27 (Tex. App.-Dallas 1987, writ denied).

The parties did not agree to try the issue of Solomon's recovery of these costs under the Agreement separately. Solomon presented no proof of these costs during the jury trial, and the jury made no findings in this regard. On this record, the trial court erred in awarding Solomon these costs because, as Hatfield asserted, the trial evidence provided no evidence to support such a recovery. *See Varner v. Cardenas,* 218 S.W.3d 68, 69–70 (Tex.2007) (successful plaintiffs could not recover appellate or foreclosure attorney's fees under Chapter 38 of the Texas Civil Practice and Remedies Code, because plaintiffs did not present any evidence at trial to prove up these fees); *University of Texas at Austin v. Ables,* 914 S.W.2d 712, 718 (Tex.App.-Austin 1996, no writ) (trial court abused its discretion by awarding attorney's fees as to which no evidence was presented at the jury trial; trial court could not award fees based on evidence presented after trial because the parties did not agree to try this issue to the bench and the opposing party objected); *Flint & Associates,* 739 S.W.2d at 626–27 (trial court erred in

---

7. For this reason, Solomon's reliance on *Rogers v. Walmart Stores, Inc.,* 686 S.W.2d 599, 600 (Tex.1985), is misplaced. *Rogers* addressed the trial court's discretion under Rule 141 to allocate normal, taxable court costs to the unsuccessful party; it did not deal with any purported power under Rule 141 to assess as taxable court costs items that are not within the scope of taxable court costs under Texas statutes, rules, and common law. *See Rogers,* 686 S.W.2d at 600–601.

awarding non-taxable court costs because, even if these costs were recoverable under the parties' contract, the parties seeking these costs did not prove their entitlement to recover them during the jury trial and did not obtain a stipulation to try this issue separately). Accordingly, we sustain Hatfield's sixth issue.[8]

## Conclusion

We modify the trial court's judgment to delete the award of $109,150.22 in costs, and as modified, we affirm the trial court's judgment.

8. In his motion for rehearing, Solomon asserts that, even if the trial court erred in awarding these costs, the proper remedy is for this court to (1) order that Solomon recover only taxable costs or (2) remand this case to the trial court for re-taxation of costs. However, as stated above, the trial court did not award the $109,150.22 as taxable court costs; rather, the trial court awarded these costs under the Agreement. For the reasons stated above, the trial court erred in awarding any of these costs under the Agreement. In its judgment, the trial court did not award taxable court costs to Solomon or to Hatfield. Solomon did not perfect an appeal from this judgment, and therefore, Solomon cannot obtain greater relief on appeal than the relief granted him in the trial court's judgment. *See Pounds v. Jurgens*, 296 S.W.3d 100, 110, n. 14 (Tex.App.-Houston [14th Dist.] 2009, pet. filed). Because this court cannot grant the relief Solomon seeks in his motion for rehearing, we deny this motion.