**Reversed and Rendered and Majority and Dissenting Opinions filed August 12, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-12-00740-CV

---

### E. I. DU PONT DE NEMOURS AND COMPANY, Appellant

### V.

### ROBERT EARL ROYE AND DIANE ROYE, Appellees

---

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2009-80504**

---

## M A J O R I T Y   O P I N I O N

Appellee Robert Earl Roye was burned seriously when he fell into a pool of hot water at a chemical plant owned by appellant E. I. DuPont de Nemours & Co. Roye sued DuPont, asserting both ordinary negligence and premises liability causes of action. The trial court submitted each cause of action to the jury in separate questions, and the jury found in favor of Roye on both. Based on the jury's findings, the trial court signed a final judgment awarding Roye the damages

found by the jury less settlement credits. DuPont appeals from that judgment.

Although DuPont raises multiple issues on appeal, we need only address the first and third because they are dispositive. In its first issue, DuPont contends the trial court erred when it submitted Roye's ordinary negligence cause of action to the jury because Roye was limited to a premises liability cause of action. In its third issue, DuPont contends that even assuming Roye was an invitee of DuPont at the time he was injured, Roye did not establish that DuPont owed Roye any duty regarding the condition of the premises that caused his injuries. Because we agree with DuPont on both its first and third issues, we reverse and render a take-nothing judgment.

## BACKGROUND

DuPont owns a chemical plant with multiple manufacturing units in LaPorte, Texas. Prior to 1999, DuPont owned and operated the entire facility, including a formaldehyde production unit and a tetrahydrofuran (THF) production unit. Formaldehyde is used in the manufacture of THF. Steam is a key component used in the production of the chemicals manufactured at DuPont's plant, as well as a by-product of the manufacture of formaldehyde. Because steam is used throughout the facility, there is a complex system of steam pipelines running through the DuPont plant. Roye was burned by hot condensate that had collected in a pool underneath one of the pipelines.

### A. DBW builds a steam pipeline for DuPont's plant.

In 1999, DuPont contracted with D. B. Western, Inc.—Texas (DBW) to supply formaldehyde and steam to DuPont's plant. As a result of this agreement, DBW built a formaldehyde manufacturing plant on land purchased from DuPont that was adjacent to but outside the fence surrounding DuPont's chemical plant.

2

DBW also agreed to design and construct a pipeline system to transport the formaldehyde and steam to the DuPont plant. The pipeline system consists of a pipeline support rack elevated twenty-six feet above the ground that carries separate pipelines for formaldehyde and steam. DuPont agreed it would be responsible for routine visual inspection and maintenance of the portion of the pipeline system located within its facility. Once construction was complete, this responsibility was assigned to DuPont operators working in the THF unit. Roye was one of those DuPont operators.

DuPont had final authority over the design of the pipeline system on its premises, and it also served as the construction manager for the project. As steam travels along the pipeline, some of the steam condenses into liquid. To remove this condensate from the pipeline, six steam traps were built into the part of the pipeline traversing DuPont's property. Steam traps, like all other parts of the units in a chemical plant, require regular maintenance because they wear out and can also malfunction.[1] As a result, DuPont had operators inspect the equipment in their areas of responsibility during every shift. In addition, DuPont hired an outside company, Spirex Sarco, to survey all of the steam traps within the DuPont facility regularly. These surveys continued after DuPont sold the THF unit to Invista, S.a.r.l. in 2004. Finally, every employee working inside the DuPont facility, whether an employee of DuPont or Invista, was charged with the responsibility to report any malfunctioning equipment they observed.

DBW asked DuPont to provide a specification for disposing of the condensate from the six steam traps. In response to this request, DuPont sent DBW "Specification P6D Condensate Disposal French Drain Method." P6D calls

---

[1] Van Mayberry, a DuPont mechanic at the LaPorte facility, testified that steam traps can fail and then start working properly again. Mayberry described steam traps as unpredictable.

for the installation of a French drain—consisting of a clay or concrete pipe two feet in diameter that is buried vertically in the ground and filled with crushed stone or gravel—beneath a steam trap.[2]  When the steam trap suspended from the pipeline discharges hot condensate, the French drain catches it and gives it time to cool to a safe temperature before releasing it into a storm sewer or drainage ditch.  The design of the DBW steam pipeline, as approved by DuPont, called for the installation of French drains under all six steam traps on DuPont's property.

Although the design called for the installation of French drains under all six steam traps, they were only installed under two.  The four remaining steam traps discharged the condensate directly onto the ground.  Gerald Hirst, DuPont's corporate representative during trial, testified that discharging hot condensate onto the ground could be a safe alternative "when all parties agree that it's a safe location that people are not accessing on a regular basis."  According to Hirst, DuPont's on-site construction supervisors John Ponder and Oscar Gonzalez made the decision that it was safe to not install four of the French drains.[3]  Both Ponder and Gonzalez testified at trial, and each denied making the decision to not install these French drains.  Gonzalez testified that the decision to not install the drains was made by the DuPont design review team during a construction status meeting.  Ponder testified that the steam traps where the French drains were not installed were located in "open territory within the plant site."

---

[2]  According to Specification P6D, French drains are not the preferred method for disposing of hot condensate, which is a valuable commodity.  P6D provides: "where conditions make it difficult to dispose of hot condensate by preferred methods, a French drain, constructed in accordance with this standard may be used."

[3] John Ponder was a DuPont employee at the time the DBW pipeline was constructed. Oscar Gonzalez was a Kellogg, Brown & Root employee serving as a field construction coordinator for projects at DuPont's facility.  Neither was an engineer.

The DBW steam pipeline is part of a complex steam distribution system at the DuPont facility. Steam is generated by producers such as DBW and Co-Gen, an electricity generator. The steam producers send the steam through metered pipelines to the DuPont steam header. From the steam header, the steam is transported to the different units located inside the DuPont facility, including the Invista THF unit, through additional pipelines. Ponder explained that while the DBW steam pipeline could ordinarily be shut down without also requiring DuPont to shut down its operations, the system requires that a balance be maintained between the supply of steam entering the system and the amount of steam exiting the system.

**B.    Invista buys part of the plant, hires Roye, and contracts to inspect the pipeline.**

In 2004, DuPont sold the THF unit to Invista. The sale did not include the land; instead, DuPont and Invista entered into a long-term ground lease. Once DuPont sold the THF unit, the DuPont facility became a shared industrial complex located within a single fence line. In other words, there were no internal fences separating the Invista THF unit from the remainder of the facility. The ground lease granted Invista shared and non-exclusive easements to all "areas used by Invista on the Plant Site on the date of [the] Lease." These shared and non-exclusive easements included the route of the DBW pipeline.

When DuPont sold the THF unit, the DuPont employees working in that unit, including Ponder and Roye, became Invista employees.[4] The employees' job duties did not change as a result of the sale. When it purchased the THF unit, Invista contracted with DBW to purchase the steam produced by DBW's formaldehyde plant. Invista also contracted with DBW to inspect and maintain the

---

[4] Invista hired Gonzalez as its maintenance supervisor in 2006.

DBW pipeline system located "on its site."

### C. A pool of hot water develops in the ground under pipeline steam trap 5, and Roye falls into it and is seriously injured.

On February 6, 2008, a DuPont employee gave his supervisor a work ticket reporting that steam trap 5 on the DBW steam pipeline was malfunctioning by "blowing through" steam.[5] Steam trap 5 was located in the DuPont portion of the shared industrial complex, and it was one of the DBW steam traps without a French drain underneath to catch the released condensate. The DuPont supervisor passed the ticket up the line, where a DuPont planner and a DuPont scheduler determined that the malfunctioning steam trap was DuPont's responsibility to repair. As a result of this decision, a DuPont work order was generated, and a supervisor gave it to a DuPont operator to set up the repair. After the operator had set up the job, on March 5, 2008, a DuPont supervisor gave a work order to DuPont mechanic Van Mayberry to go out and repair the malfunctioning steam trap. Mayberry testified that once he received a work order, he would complete the repair if he could do it safely, and that it did not matter to him which company owned the part being repaired.

After receiving the work order, Mayberry went to steam trap 5. He observed a wooden pallet at the edge of a water-filled hole approximately two to three feet across and one foot deep. According to Mayberry, the water in the hole extended underneath the leading edge of the pallet, which was within arm's reach of the steam trap hanging from the pipeline above. Mayberry stepped onto to the pallet to keep his shoes dry and examined the steam trap. Mayberry determined that he could not safely repair the trap because the job required the DBW steam pipeline to

---

[5] This steam trap is identified as steam trap 1360 on the Spirex Sarco surveys. It was primarily identified during trial as steam trap 5 because of its location on the DBW pipeline. We adopt that identification here.

be shut down.[6] Mayberry made that notation on the work order and turned it in to his supervisor as incomplete. Mayberry testified that he heard at a later time that steam trap 5 was not DuPont's and he did not know what happened to the steam trap after that date. Mayberry did not report the hole he encountered during his attempt to repair steam trap 5 because "everybody knew there was a hole out there where the steam trap had been blowing."

In 2009, Roye worked as an operator in Invista's THF unit. As an operator, Roye's duties included visually inspecting the DBW pipeline each shift. While inspecting the DBW pipeline on April 7, 2009, Roye observed steam trap 5 continuously blowing steam. Recognizing that the steam trap had malfunctioned, Roye wrote up and submitted a work notification of the malfunction. Ron Hickman, another Invista employee, testified that Roye was training him as an operator when they observed the malfunctioning steam trap. According to Hickman, there was a pool of steaming water beneath the steam trap that he estimated was approximately four feet by six feet in size.

On May 5, 2009, Roye reported for work and spoke with Oscar Gonzalez. Gonzalez told Roye that he had work tickets for the repair of steam traps on the DBW pipeline on the day's schedule, and he asked if Roye could look at them to determine whether they could be set up for mechanics to perform the repairs. According to Roye, the first step in setting up a repair job for the mechanics is to determine whether a tagging or lock out list is on the computer.[7] When Roye

---

[6] Mayberry testified that a DuPont operator had already noted on the work order that the valve handle was missing, and Mayberry concluded there was no way to isolate the steam trap.

[7] According to Roye, the lock out list is created by an operator and it establishes the procedure an operator will use to set up the steam trap to be repaired safely. This list would be reviewed by another operator and if both operators agreed, it would be submitted to a supervisor for approval. Only after the supervisor approved the list would the operator go to the steam trap and actually perform the set-up procedure.

determined there was not a list on the computer, he decided to go to the steam trap, make the list, and then enter it into the computer.

Roye drove a golf cart to steam trap 5 and parked it about ten feet away from the pallet and pool of condensate. Roye testified that he observed the steam trap blowing, the ground with grass around the pool, and the wooden pallet. Roye testified that he walked up to the pallet and could clearly see the bottom slats with the ground and grass underneath them. Roye also saw that there was some water underneath the pallet. Roye examined the steam trap and noticed the missing valve handle. Roye knew there was a small tag on the valve identifying the type of valve. With this information, Roye could possibly obtain a replacement handle that would enable the steam trap to be repaired without waiting for the entire line to be shut down. Roye testified that he needed to get close enough to the valve to read the small tag.

According to Roye, the blowing steam trap was about one-and-a-half feet away from the pallet. Roye testified he was accustomed to working around blowing steam traps because he had frequently been required to do so during his lengthy career at the DuPont facility. After visually examining the pallet, Roye pushed down on the pallet with his foot to test it for integrity. When it seemed safe, Roye stepped up on the pallet. Roye testified that when he took the next step, the ground gave way beneath the pallet like a trap door opening, dropping him into the pool of 400-degree condensate. Roye used the pallet to pull himself out of the pool, but not before he suffered second- and third-degree burns over 75% of his body, from his chest down to his feet. Roye was able to call for help on his radio and when his co-workers found him, he was taken to the hospital by helicopter ambulance. This began a 70-day hospital stay followed by treatment at two different rehabilitation hospitals. As a result of his burns, Roye has significant

permanent impairments.

### D. Roye sues DuPont and obtains a judgment in his favor.

Roye filed suit against DuPont and other defendants alleging two principal causes of action: premises liability and negligence in the design, construction, and maintenance of the steam pipeline and steam traps. Roye's wife, Diane Roye, asserted a loss of consortium cause of action.[8] Under his premises liability theory, Roye alleged that he was an invitee of DuPont. He further alleged that the pool of hot condensate presented an unreasonable risk of harm because it eroded the soil beneath the surface, creating an unsupported ledge that collapsed under Roye's weight, dropping him into the pool. Under his negligence cause of action, Roye alleged that DuPont negligently designed the DBW pipeline because it made the decision to omit a French drain under steam trap 5, which he further alleged would have prevented the creation of the hot pool of condensate and subsurface soil erosion. Prior to trial, he settled his claims against DBW, nonsuited other defendants, and proceeded to trial against DuPont.

At the conclusion of the evidence, the trial court submitted both theories of liability to the jury as well as a question asking whether Roye was an invitee of DuPont. The jury found that Roye was an invitee of DuPont and also found DuPont liable under both the negligence and premises liability theories. The trial court signed a judgment against DuPont for $11,568,627.35, which equaled the damages found by the jury reduced by settlement credits. This appeal followed.

---

[8] Because Mrs. Roye's claims are derivative of her husband's, we do not address her claims separately. *See In re Labatt Food Servs., L.P.*, 279 S.W.3d 640, 646 (Tex. 2012) (observing that loss of consortium claims are derivative in the sense that family members must establish that the defendant is liable for the injured family member's injuries in order to recover damages).

ANALYSIS

As mentioned above, DuPont brings four issues on appeal challenging the judgment against it. Because they are dispositive of this appeal, we need only address the first and third issues.

## I. Because Roye was injured by a condition of DuPont's premises, the trial court erred by submitting an ordinary negligence question against DuPont.

Question 1 of the jury charge asked the jury "did the negligence, if any, of [DuPont, DBW, Invista, or Roye] proximately cause the occurrence in question?" Question 1 included standard common-law negligence definitions based on the Texas Pattern Jury Charges.[9] The trial court also instructed the jury that in answering Question 1, it should "not consider DuPont's negligence, if any, in its role as premises owner, as set forth in Question 4." During the charge conference, DuPont objected to the submission of Question 1 because the "case law is very clear the case should only be submitted as a premises condition liability case and not as a general negligence case." The trial court overruled the objection. The jury found that all four parties listed in Question 1 were negligent.

In its first issue, DuPont argues the trial court erred when it overruled the objection and submitted this ordinary negligence theory to the jury. We agree.

## A. We review the legal correctness of the jury charge de novo.

A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *Hatfield v. Solomon*, 316 S.W.3d 50, 57 (Tex. App.—Houston [14th Dist.]

---

[9] Question 1 defined "negligence" as the "failure to use ordinary care, that is failing to do that which a person or company of ordinary prudence would have done under the same or similar circumstances or doing that which a person or company of ordinary prudence would not have done under the same or similar circumstances."

2010, no pet.) (citing *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex. 1999)).  The goal is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely.  *Hatfield*, 316 S.W.3d at 57.  To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct.  *Id.*  We review whether a challenged portion of a jury charge is legally correct using a de novo standard of review.  *Id.* (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex. 2003)).

### B.     Roye was not injured as a contemporaneous result of a negligent activity by DuPont, so he is limited to a premises liability claim.

Under Texas law, a person injured on another's property has two potential causes of action against the owner of the property: (1) a negligence claim for negligent activity on the premises, and (2) a premises liability claim for an unreasonably dangerous condition on the premises.  *Clayton W. Williams Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997); *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992).  Although both liability theories are based on negligence principles, they are independent theories that require different elements of proof.  *Olivo*, 952 S.W.2d at 529.  When the alleged injury is the result of a negligent activity, the injured party must have been injured by, or as a contemporaneous result of, the activity itself.  *Keetch*, 845 S.W.2d at 264.  When the alleged injury is caused by an unsafe or dangerous condition on the premises, the injured party is limited to a premises liability theory and must prove his status to establish the type of duty owed by the premises owner.  *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006); *see H. E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992); *Wyckoff v. George C. Fuller Contracting Co.*, 357 S.W.3d 157, 163–64 (Tex. App.—Dallas 2011, no pet.).  Artful phrasing of the pleadings to encompass alleged design defects or any other theory of negligence does not affect the application of premises liability law.  *Wyckoff*, 357 S.W.3d at 163.

11

In the present case, Roye has not alleged or offered evidence that he was injured as a contemporaneous result of an activity by DuPont. Instead, Roye seeks to hold DuPont, the current owner of the premises, liable for his injuries caused by an allegedly unsafe or dangerous condition on DuPont's premises: a pool of hot condensate that resulted in concealed sub-surface erosion of the soil. Because Roye's claim is based on an unsafe or dangerous condition of the property, we hold that the cases cited above limited him to a premises liability theory of recovery.

Roye asserts that a premises owner can also be found liable for ordinary negligence if it played a role in designing an improvement that creates a hazardous condition over time, but he identifies no cases applying that rule to a current premises owner. It is of course true that a person injured by such a condition may have a cause of action against the premises owner, but the cases just discussed confirm that the action sounds in premises liability, not ordinary negligence.

The cases on which Roye relies are distinguishable because they involve defendants who did not own or control the premises at the time the alleged injuries occurred. *See In re Weekley Homes, L.P.*, 180 S.W.3d 127, 132 (Tex. 2005) ("[A] contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities, or by premises conditions it leaves behind."); *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 54 (Tex. 1997) (stating that person who creates a dangerous condition owes a duty of care even if person is not in control of the premises at the time of the injury); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997) (observing in summary judgment case that court had "recognized that under some circumstances, one who creates a dangerous condition, even though he or she is not in control of the premises when the injury occurs, owes a duty of due care"); *City of Denton v. Page*, 701 S.W.2d 831, 835 (Tex. 1986) (observing that "a private person who has created a dangerous

12

condition may be liable even though not in control of the premises at the time of injury"); *Strakos v. Gehring*, 360 S.W.2d 787, 790 (Tex. 1962) (stating that contractor who left dangerous condition on premises can still be held liable even though contractor's work had been accepted and another had assumed control of the premises); *Jenkins v. Occidental Chem. Corp.*, 415 S.W.3d 14, 30–33, 39 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) (remanding for entry of judgment in favor of injured chemical worker because former premises owner could be held liable for negligent design of acid addition system).

These cases establish that a person who formerly owned or controlled property and created a dangerous condition is not insulated from liability when it sells or departs from the property and leaves the condition behind. But this principle does not apply to our case, in which DuPont still owns the property and can be sued on a premises liability theory.

Because Roye was limited to a premises liability theory of recovery, we sustain DuPont's first issue and hold the trial court erred when it submitted an ordinary negligence cause of action against DuPont to the jury. *See Shumake*, 199 S.W.3d at 284; *Warner*, 845 S.W.2d at 259; *Wyckoff*, 357 S.W.3d at 163. Accordingly, the jury's finding that DuPont was negligent is immaterial and cannot support a judgment against DuPont. *See Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999) (stating that jury finding on a question that should not have been submitted is immaterial and may be disregarded); *Nat'l City Bank of Ind. v. Ortiz*, 401 S.W.3d 867, 883 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (same); *see also Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (stating rendition is appropriate when submitted jury question is immaterial).

13

**II. Because the evidence does not show DuPont had actual or constructive knowledge of the concealed hazard, Roye failed to establish that DuPont owed him a duty under premises liability law.**

Turning to Roye's premises liability theory, DuPont contends in its third issue that there is insufficient evidence it owed Roye a duty to protect him from the obvious danger posed by the open pool of hot condensate. DuPont begins its argument by accepting, for purposes of this issue, that Roye was DuPont's invitee when he was injured as a result of his fall into the pool. DuPont then asserts that the only duty it owed Roye as an employee of an independent contractor working on its premises was a duty to protect him from concealed hazards that DuPont knew about or could have discovered through a reasonable inspection. DuPont concludes that because there was no evidence it knew or should have known about the concealed hazard Roye alleges caused his fall into the pool of hot condensate, the judgment against it must be reversed and a take-nothing judgment rendered. We agree with DuPont.

**A. Whether DuPont knew or should have known of a concealed hazard that caused Roye's injury is a legal question.**

As in any negligence action, a defendant in a premises liability case is liable only to the extent it owes the plaintiff a legal duty. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217 (Tex. 2008). The plaintiff bears the burden to produce evidence of duty, and liability cannot be imposed if no duty exists. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006); *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). Whether a duty exists is a question of law for the court to decide from the facts surrounding the occurrence at issue. *Golden Spread Council, Inc. No. 562 of the Boy Scouts of America v. Akins*, 926 S.W.2d 287, 289 (Tex. 1996); *Pico v. Capriccio Italian Rest., Inc.*, 209 S.W.3d 902, 906 (Tex. App.— Houston [14th Dist.] 2006, no pet.). Although our dissenting colleague argues

forcefully that we should honor the jury's verdict in this case, we are also required to follow the supreme court's holding that the existence of a duty in a premises liability case is "not for the jury to decide under comparative negligence or anything else." *Moritz*, 257 S.W.3d at 217. Once the plaintiff establishes that a defendant owed a duty, he must also prove the defendant breached that duty and the breach proximately caused damages. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010).

Generally, a property owner owes invitees a duty to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition that the property owner knew or should have known about. *Id.* That duty is modified when the plaintiff is an employee of an independent contractor, as Roye was here. *Moritz*, 257 S.W.3d at 215; *Wilhelm v. Flores*, 195 S.W.3d 96, 98 (Tex. 2006) (per curiam) (stating that premises owner owed employee of business invitee, who was on premises to remove bee hives purchased by invitee, no greater duty than that owed to employee of independent contractor); *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 & n.1 (Tex. 1999).

A premises owner has no duty to warn such employees of open and obvious hazards or to make those hazards safe, but the owner does have a duty with respect to pre-existing concealed hazards that it knows or should have known about. *Moritz*, 257 S.W.3d at 215–16; *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000).[10] More specifically, a landowner may be liable for injury caused by concealed deterioration of its premises if it knew the premises had become unsafe or a reasonable inspection, if conducted, would have discovered that the

---

[10] *See also Coastal Marine Servs. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex. 1999) (per curiam); *cf. Del Lago Partners*, 307 S.W.3d at 767 (considering as part of legal duty analysis whether owner knew or had reason to know of an unreasonable and foreseeable risk of harm).

deterioration had caused an unsafe condition. *CMH Homes, Inc.*, 15 S.W.3d at 101. Evidence that a property owner knew of a safer, feasible alternative design, without more, is not evidence that the owner knew or should have known that a condition on its premises created an unreasonable risk of harm. *Id.* at 102.

**B.** **Roye failed to establish that a reasonable inspection would have revealed the ledge beneath the ground near the hot pool of condensate.**

To meet his burden to establish that DuPont owed him a legal duty, Roye first had to establish the existence of a concealed hazard. *Moritz*, 257 S.W.3d at 215; *CMH Homes, Inc.*, 15 S.W.3d at 101. We must therefore determine the nature of the hazardous condition that injured Roye. The parties acknowledge, and we agree, that the hazard was not the steam trap hanging from the elevated pipeline and discharging hot condensate. Rather, the hazard was located in the ground underneath the steam trap.

DuPont argues that the hazard was the pool of hot condensate that had developed in the ground, and that it owed no duty to warn of this hazard, which was open and obvious. But the visible pool was not the only hazard. Roye offered evidence that the condensate had eroded the subsoil beneath the surface of the ground adjacent to the pool over time, creating an unsupported ledge of topsoil that collapsed when Roye stepped onto the pallet that rested on this ledge. Other courts have recognized that even when certain aspects of a hazard are open and obvious, the premises owner may still be liable if the specific conditions that caused the employee's injury were concealed. *Griffin v. Shell Oil Co.*, 401 S.W.3d 150, 160–61 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *see also Kilchrist v. Sika Corp.*, No. 3:10-CV-2567-B, 2012 WL 3599383, at \*2 (N.D. Tex. Aug. 22, 2012), *aff'd*, 555 Fed. Appx. 350 (5th Cir. 2014).

16

We conclude the record contains abundant evidence that the ledge of topsoil next to the pool of hot condensate was a concealed hazard on the day Roye went to set up the repair of steam trap 5. Roye's safety expert identified this ledge as the hazard that caused Roye's injury. There is no evidence in the record, however, that DuPont had actual knowledge of the concealed ledge at any relevant time. Therefore, we turn to whether the record established that DuPont had constructive knowledge of an unreasonable risk of harm associated with stepping on the ground near the pool.

In premises cases, constructive knowledge can be established by showing that the hazardous condition existed long enough for the owner to have discovered it through a reasonable inspection. *CMH Homes, Inc.*, 15 S.W.3d at 102–03. Here, while there is abundant evidence a concealed hazard existed the day of the occurrence, there is no evidence in the record demonstrating when the open and obvious pool of hot condensate created the concealed ledge. The mere passage of time between Mayberry's use of the pallet when he unsuccessfully attempted to repair steam trap 5 in March 2008 and Roye's fall into the pool of hot condensate when he stepped onto the pallet in May 2009 is insufficient to establish that DuPont had constructive knowledge of the concealed hazard. *See id.* at 101 (holding knowledge that stairs would become unstable after passage of twelve to fifteen months simply by virtue of use was insufficient to establish constructive knowledge of dangerous condition).

Roye does not contend, and there is no evidence in the record indicating, that DuPont failed to conduct any inspections of its premises.[11] *See Moritz*, 257 S.W.3d at 215 (stating property owner has duty to inspect premises). In addition,

---

[11] In fact, Roye admits throughout his appellate briefing that DuPont conducted inspections of the premises.

there is no evidence in the record establishing what type of reasonable inspection a landowner in DuPont's position should undertake, or that such a reasonable inspection would have revealed the ledge—a concealed hazard that every witness who testified on the subject agreed could not have been discovered through a visual inspection. *See CMH Homes, Inc.*, 15 S.W.3d at 102 (stating plaintiff "would be entitled to recover if he presented evidence that [the defendant] actually knew that the platform and step unit had become unstable or if a reasonable inspection would have revealed that the unit was no longer safe"); *see also Fort Brown Villas III Condo Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 884 (Tex. 2009) ("Here, no evidence was presented that Fort Brown actually knew the chair [that broke] had become dangerous or that Fort Brown failed to reasonably inspect the chairs.").

In his brief, Roye points to various types of evidence that he argues support charging DuPont with constructive knowledge. This evidence includes the opinion of DuPont's geotechnical engineer that the hole containing the hot condensate developed and grew over a long period of time. Roye also emphasizes that DuPont knew about the pool of hot condensate but did not erect barricades around it. In addition, our dissenting colleague explains how hot water released from the steam trap under pressure eroded the soil beneath to create a hole that filled with hot water.[12] But the erosion-created hole and the pool of hot condensate were open and obvious conditions of which everyone had actual knowledge, and as to which DuPont owed Roye no duty. Thus, the facts that the hole was created by erosion over a substantial length of time, and that DuPont knew about the hole and did not place barricades around it, cannot be used to impute constructive knowledge of the

_____

[12] Much of the erosion testimony on which the dissent relies came from Roye's geotechnical engineering expert and was not specific to this case. The expert was not asked to do any independent analysis of soil conditions at the accident site and determine what happened.

18

concealed hazard—the hidden ledge near the hole—to DuPont. *See Moritz*, 257 S.W.3d at 215–16; *CMH Homes, Inc.*, 15 S.W.3d at 101.

Next, Roye contends that DuPont's commissioning of surveys to track the functioning of the steam traps on its premises, and Mayberry's failed attempt to repair steam trap 5, impute constructive knowledge to DuPont. As noted above, however, the malfunctioning steam trap is not the hazard that injured Roye. Roye's argument is also contrary to the testimony of his own safety expert, who opined that steam trap 5's malfunction had no effect on the development of the pool of hot condensate and the concealed subsurface ledge.

Finally, Roye points to DuPont's decision to not install a French drain under steam trap 5 as called for by its design standard.[13] But the supreme court has determined that a premises owner's awareness of a safer and feasible alternative design, without more, is insufficient to impose constructive knowledge of a hazardous condition on DuPont. *CMH Homes, Inc.*, 15 S.W.3d at 102 ("To our knowledge, no court has ever suggested that if it is possible to construct buildings or fixtures with materials that are impervious to wear and tear, an owner has a legal duty to do so and is charged with knowledge of an unreasonably dangerous condition if it does not."); *see also Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407–08 (Tex. 2006) ("Ordinarily, an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that may have produced the condition.").

---

[13] Part A of the Background section above summarizes evidence that DuPont considered discharging condensate onto the ground to be a safe alternative when all parties agree that people do not regularly access the location, and that the DuPont design review team approved the decision to use that method of discharge. The dissenting opinion correctly points out, however, that there is evidence such discharge causes erosion and that DuPont's French drain design mitigates erosion.

Roye also asserts that a French drain was necessary because DuPont knew steam traps created the risk of holes and cave-in problems, and that careful inspection was essential to detect such stability problems. But the evidence Roye cites does not support this assertion. Rather, it shows that soil borings dug to determine the proper foundations for the rack supporting the elevated pipeline revealed mostly clay throughout the soil profile,[14] but one boring 150 feet west of the line revealed sand below eight feet in depth, which a DuPont consultant reported could create stability problems requiring special construction procedures. In the opinion of Roye's own geotechnical engineering expert, however, soil testing conducted a mere 20 feet from the site of the injury has absolutely no predicting power regarding conditions at the site. Accordingly, the existence of sand at least 150 feet away and at eight feet in depth would not suggest to DuPont that stability problems existed at the site of Roye's injury or at three feet in depth, which was the approximate depth of the hole at the time of his injury.[15]

Our dissenting colleague agrees with Roye and points to the testimony of his safety expert. Based on the evidence just discussed regarding DuPont's decision to omit the French drain and its knowledge of soil borings, as well as the tendency of condensate to openly and obviously erode the soil and pool, Roye's safety expert opined that the hazard of an unsupported ledge of topsoil next to the pool could be reasonably expected to occur. As previously explained, however, supreme court precedent compels the conclusion that the evidence on which the expert based his

---

[14] There was also evidence from DuPont's geotechnical engineering expert that the soils at the plant site were consistent sandy clays and clays.

[15] The dissenting opinion also points to evidence that DBW wanted to drill the pits for the French drains (two of which were ultimately installed) at the same time it drilled the foundations for the pipeline support rack. We fail to see how this evidence of efficient construction management indicates that DuPont had reason to suspect there was sand right under the topsoil at the site of Roye's injury.

20

opinion does not support constructive knowledge of the concealed hazard. Moreover, even if that evidence could support his opinion, the supreme court has held that constructive knowledge that a hazardous condition *could* be reasonably expected to occur at some future date is insufficient. *CMH Homes, Inc.*, 15 S.W.3d at 102 (rejecting argument that defendant "at least had constructive knowledge of the condition of the steps because it knew the steps could become unstable"). Rather, there must be evidence that the condition *did* occur a sufficient length of time before the injury that a reasonable inspection would have revealed it. *Id.* at 102–03; *see also Brookshire Grocery Co.*, 222 S.W.3d at 407–08. As already discussed, there is no such evidence in this record.

Our dissenting colleague also contends this conclusion regarding constructive knowledge is beside the point, as the jury was allowed to infer under *Keetch* that DuPont had actual knowledge of the unsupported ledge of topsoil near the pool because it "created the defect" by omitting a French drain. *Post*, at 2, 7. We conclude the dissent's reliance on *Keetch* is misplaced for three reasons.

First, *Keetch* understandably did not involve a challenge to whether the premises owner supermarket owed a legal duty to the plaintiff shopper; certainly it did. In this case, however, DuPont's position is that it owed Roye no duty as an independent contractor's employee because the only defect it knew or should have known about was open and obvious. The question of duty is one for the court to decide (nothing in *Keetch* says otherwise), and an inference that DuPont had actual knowledge of an open and obvious defect—the erosion-created hole filled with hot water that resulted from the omission of a French drain—cannot support a duty as explained above.

Second, *Keetch* did not hold that creating a condition always supports an inference of knowledge, but merely that it "may" do so if there is also evidence the

21

defendant "knew" or should reasonably have foreseen from an inspection that the condition "presented an unreasonable risk of harm." 845 S.W.2d at 265, 266; *Seideneck v. Cal Beyreuther Assocs.*, 451 S.W.2d 752, 754–55 (Tex. 1970) (holding that although defendant placed rug on which plaintiff tripped, there was legally insufficient evidence it should reasonably have foreseen from inspection a probability that the rug would result in injury).[16] Here, as previously discussed, there is no evidence DuPont had either actual or constructive knowledge of an unreasonable risk of harm to those stepping on the concealed ledge of apparently solid ground adjacent to the open and obvious hole filled with hot water.

Third, *Keetch* and similar cases address arguments that knowledge should be inferred when the defendant "created a condition that posed an unreasonable risk of harm" at the time it was created, even though the harm may have occurred later. 845 S.W.2d at 265; *see also CMH Homes*, 15 S.W.3d at 101 (explaining that grape display in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983), "constituted a dangerous condition from the moment it was used").[17] Indeed, it is

---

[16] *See also Knox v. Fiesta Mart, Inc.*, No. 01-09-01060-CV, 2011 WL 1587362, at *5 (Tex. App.—Houston [1st Dist.] April 21, 2011, no pet.) (holding actual knowledge of placement of object is not evidence of actual knowledge that object presented a hazard). The dissent concedes as much: "it isn't enough that the owner simply created a condition that turns out to be hazardous;" there must also be evidence "that an owner has created a condition that it could reasonably foresee poses an unreasonable risk of harm" for the inference of knowledge to arise. *Post*, at 4. This principle is not inconsistent with our opinion in *Grayson v. Anselmo*, No. 14-06-01073-CV, 2008 WL 660433 (Tex. App.—Houston [14th Dist.] Mar. 11, 2008, no pet.) (mem. op.). *Grayson* cannot overrule *Seideneck* and *Keetch*, nor does it purport to do so. *Grayson* did not address a duty dispute, and the defendant there did not argue that even if he created the condition (an inadequately attached railing on a ramp), he could not reasonably foresee that it presented an unreasonable risk of harm. Thus, we had no occasion to address *Seideneck*'s holding on that issue. Instead, we held that an implied finding in a bench trial that the defendant did not have constructive knowledge of the dangerous condition was not against the great weight and preponderance of the evidence. *Id.* at *4.

[17] In *Keetch*, the plaintiff alleged the defendant's employee "put the foreign substance [on which the plaintiff slipped] on the floor." 845 S.W.2d at 265. The dissent's illustrations of a freezer lid balanced precariously against a table leg and a lit bomb with a long fuse also fall

22

the temporal connection between the defendant's creation of the condition and its dangerousness that makes it plausible to infer the defendant knew of the danger.[18] Here, there is no evidence that the ground near the steam trap posed an unreasonable risk of harm at the time DuPont omitted a French drain. Rather, the concealed ledge developed over the next several years. For these reasons, *Keetch* does not support an inference of actual knowledge in this case. As discussed above, *CMH Homes* provides the framework for analyzing knowledge of conditions that develop and become dangerous over time. 15 S.W.3d at 102–03.[19]

Because Roye did not present evidence demonstrating that a reasonable inspection would have discovered the concealed ledge, we hold as a matter of law that Roye failed to meet his burden to establish DuPont owed him a duty to warn

---

within this category of cases in which the condition posed an unreasonable risk of harm from the time it was created. *See Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 645–46 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *Post*, at 4, 6.

[18] *Keetch*, 845 S.W.2d at 266; *Coffee v. F.W. Woolworth Co.*, 536 S.W.2d 539, 540 (Tex. 1976) (holding store personnel in process of changing display had actual knowledge of its empty and dangerous condition); *Rice Food Market, Inc. v. Hicks*, 111 S.W.3d 610, 613 (Tex. App.— Houston [1st Dist.] 2003, pet. denied) (holding no evidence defendant had actual knowledge that sign posed unreasonable risk of harm where "there is no evidence in the record that the sign was a dangerous condition from the moment it was installed").

[19] The dissent argues that *CMH Homes* is not applicable because it does not address actual knowledge of defects created by the owner. We disagree. The first part of the analysis in *CMH Homes* addresses that very issue, while the second part addresses constructive knowledge. In the first part, the supreme court discusses the plaintiff's theory that CMH had "actual knowledge" that the steps it installed presented an unreasonable risk of harm because it knew at the moment it installed the steps that they would become unstable. *CMH Homes*, 15 S.W.3d at 99. To support this argument, the plaintiff relied on *Corbin*, which the supreme court has described as a case about "when knowledge may be inferred from the creation of a condition." *Keetch*, 845 S.W.2d at 265. The supreme court distinguished *Corbin* and rejected the plaintiff's actual knowledge theory, however, concluding that the steps were not a dangerous condition from the inception of their use. *CMH Homes*, 15 S.W.3d at 101. As the court pointed out, the prospect of deterioration "does not necessarily mean that the owner or occupier has *created* a dangerous condition." *Id.* (emphasis added). Because this case likewise involves a condition that was not dangerous at inception but deteriorated over time, *CMH Homes* supports our conclusion that the *Keetch* inference of actual knowledge does not arise here.

of a concealed hazard that DuPont knew or should have known about. *See Moritz*, 257 S.W.3d at 215 (stating owner has duty to inspect premises and warn independent contractor's employee of concealed hazards owner knows or should have known about); *CMH Homes, Inc.*, 15 S.W.3d at 103 ("To impose constructive knowledge when the owner . . . would not have discovered the dangerous condition from a reasonable inspection is to dramatically alter premise liability law."); *Wyckoff*, 357 S.W.3d at 165. We therefore sustain DuPont's third issue on appeal and hold that the jury's premises liability finding cannot support a judgment against DuPont.

## CONCLUSION

Having sustained DuPont's first and third issues on appeal, we reverse the trial court's judgment and render judgment that appellees take nothing on their causes of action against DuPont.


/s/      J. Brett Busby
Justice

Panel consists of Justices McCally and Busby and Former Justice Simmons.[20] (McCally, J., Dissenting)

---

[20] Former Justice Rebecca Simmons, sitting by assignment.

24