Opinion issued October 1, 2019



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00700-CV

_____

**SANDRA LEDEZMA, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF ABDON LEYVA, DECEASED, AND AS NEXT FRIEND OF HIS FOUR MINOR SURVIVING CHILDREN, Appellants**

**V.**

**SEAN F. TURNER, Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-04916**

---

## MEMORANDUM OPINION

Abdon Leyva fell to his death when a tree limb broke while he was removing Christmas lights in a tree at appellee Sean Turner's residence. When he

fell, Leyva was not using any safety equipment, such as a harness that was available, and Turner was not there when the accident occurred.

Leyva's widow and children (appellants) sued Turner for wrongful death, asserting negligence and premises liability claims. Turner filed a combined traditional and no-evidence summary judgment motion, which the trial court granted. We affirm.

## Background

The summary judgment evidence consists of the deposition testimony of Turner and Luis Zamora, who Turner designated as a responsible third party in appellants' suit.

Turner testified that several years before Leyva's January 9, 2017 accident, Zamora had become Turner's yard maintenance man after initially doing irrigation and landscaping work for Turner. Turner said that Leyva worked for Zamora and that he did not know Leyva personally, but he had seen him working with Zamora at Turner's residence. Zamora explained that Leyva had his own yards, and Zamora helped Leyva with Leyva's yards while Leyva helped Zamora with Zamora's yards.

Zamora and Leyva also did some tree trimming for Turner on two or three occasions before Leyva's accident. Turner did not provide any guidance to Zamora about safety equipment for tree trimming, nor did he instruct or provide Zamora

2

with any safety protocols. Turner observed that Zamora and Leyva used a harness and ropes when they did the tree trimming, but Turner had not discussed with Zamora whether they needed to use them. Turner left the details of the tree trimming to Zamora's discretion.

Because Zamora's tree work had gone well, for Christmas in 2015, Turner asked Zamora if he would install Christmas lights in the trees in Turner's front yard. Zamora responded that he would do it and that he had done it before at other houses; he described it as "something easy to do." Zamora estimated that he had hung Christmas lights for ten to fifteen other customers. Turner bought the lights and instructed Zamora to install them in the two large trees in the front yard, in two little magnolia trees, and on bushes. Turner left up to Zamora how to install the lights. Leyva helped Zamora with the lights this first time. To remove the lights, Turner instructed Zamora to just cut them off the limbs because he was going to buy new lights for the next year. In previous years when Turner had put up the lights himself, he had found that it was easier to just cut the lights.

Turner agreed that putting lights in the trees was a dangerous job even for someone with knowledge and equipment. Turner did not think of himself as qualified to determine proper safety equipment, and he expected Zamora and Leyva to have the proper equipment to take care of themselves. Because Leyva worked for Zamora, Turner believed Leyva's safety was Zamora's responsibility.

Other than the lights and extension cords, Turner did not provide any equipment to Zamora and Leyva. Zamora testified that he had a harness and ropes for working in trees but did not have a hard hat. Zamora had never had any formal training in the use of a harness; he learned by observing someone else. Zamora said that Turner never asked him about using safety equipment while installing the lights, adding that Turner saw him and Leyva using the harness.

The next year—for Christmas in 2016—Turner had Zamora put up the lights again, but this time only in the two large trees. In working at Turner's house on the Christmas lights, Zamora did not consider himself to be Leyva's "boss" because Leyva had helped him the year before and Zamora did not "need to tell him what he had to do, or how to do [it]." Zamora did not consider that Turner had hired both him and Leyva to do the work because Zamora was the person in charge of Turner's yard. Turner paid Zamora between $1,200 and $1,500 ($500 per tree plus a bonus) to install and remove the lights. Zamora testified that Turner paid him $1,000 and that he split it with Leyva.

In late November of 2016, Zamora and Leyva started putting up the lights at the top and then worked their way down. They were putting the lights up higher than they had the year before, and that shocked Turner. And because they had started higher, they ran out of lights and Turner had to buy more. Zamora testified that Turner's instructions for installing the lights were how far up in the trees to put

4

them and to wrap the lights tightly or closely together around the branches. Zamora said that Turner told him which branches he wanted lights on and "to be careful and to go as high as we can go." They put the lights up higher than they had the year before. Zamora did not consider how Turner wanted the lights done to be dangerous.

Turner testified that, when he observed Zamora and Leyva in the trees putting up the lights, Leyva always had on a harness, but Zamora did not use a harness a majority of the time. On at least one occasion, Turner warned Zamora to be careful because he was on a branch without a harness and it concerned Turner. Zamora confirmed that Turner had told him to be careful when working in the trees. Zamora testified that he and Leyva used the harness and ropes when they installed the lights. He explained that, unlike removing the lights, wrapping the lights tightly around the branches has to be done slowly. Zamora said that, in installing the lights, Leyva was up in the trees with a harness and that Zamora passed him the lights.

On January 4, 2017, Turner communicated with Zamora by text for Zamora to let him know when he would be taking down the lights. On January 9, 2017, Turner texted Zamora again for Zamora to let him know when he would be removing the lights, and in response, Zamora informed Turner that Leyva had fallen out of the tree and was being taken to a hospital by ambulance. Turner

testified that, according to Zamora, Leyva had finished removing the lights from one of the trees, had come down but then went back up in the tree without the harness to retrieve something, and it was then that Leyva fell.

Turner did not know that Zamora and Leyva were at his residence that day, and Turner had not given Zamora instructions on how to remove the lights—whether to cut them off the branches or to unwrap them; nor had Turner provided Zamora with any safety warnings before he was to remove the lights. Turner had never communicated with Leyva at all. Zamora testified that Turner did not give them any instructions on removing the lights and that Turner was not there when they were removing the lights.

Zamora testified that he removed the lights from one tree and Leyva removed them from the other tree. He said that he and Leyva did not use the harness while removing the lights because, unlike installing them, it was easy to remove them. Zamora did admit that it was safer to use the harness and that they had the harness with them that day.

Zamora testified that he had told Leyva to use the harness that day because the branches on Leyva's tree were "a little bit more straight," explaining that when the branches are "a little bit inclined," "you can hang on to them." Leyva, however, did not use the harness while removing the lights that day. Zamora testified that Leyva "would do whatever he wanted. I would tell him to do this or to do that. If

6

he wanted to, he would do so. If not, he wouldn't . . . ." According to Zamora, if Leyva had climbed with the harness, he would not have fallen.

Zamora testified that when the branch broke and Leyva fell, he did not see it happen because he was in one tree removing lights and Leyva was in the other tree. Zamora heard a crack, turned around, and saw Leyva and a broken branch on the ground. Zamora said that Leyva fell because the branch broke. The branch was about twenty feet long, and Leyva fell from a height of approximately twenty feet.

Zamora did not know how the branch broke or how far out on the limb Leyva was when it broke. He also said that when they had installed the lights (in late November of 2016), the branch was "in good condition" or it would have broken then. But Zamora later testified that the trees had frozen during a two-to-three-day freeze before January 9, 2017, and that the branch had died. He further testified, however, that even though there had been a freeze, he did not think it was a danger to be in the trees. Zamora said that he reached the conclusion that the freeze "possibly" caused the branch to break when, after talking to family and friends at Leyva's funeral, he learned that there had been a freeze. Zamora said that Turner had not warned him that there had been a freeze.

Zamora testified that because that tree lost its leaves in the winter, he could not know if the branch was dead and did not think it was dead. He said that there was no way to know whether the branch was dead, further stating, "I think nobody

7

could have known." Zamora testified that there was no way to tell if a branch is dead until you put weight on it and it breaks.

Zamora did not think that Turner was responsible for what happened to Leyva. He thought that "nobody" was responsible because "it was an accident, and in that case, you should blame the tree. That's just nature."

**Analysis**

On appeal, the appellants challenge the trial court's granting Turner's summary judgment motion. We review summary judgments de novo. *City of Richardson v. Oncor Elec. Delivery Co.*, 539 S.W.3d 252, 258 (Tex. 2018). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *City of Richardson*, 539 S.W.3d at 258–59. A defendant moving for summary judgment must conclusively negate at least one essential element of the plaintiff's cause of action. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997); *Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 704 (Tex. App.—Houston [1st Dist.] 2014, no pet.). If the movant establishes its entitlement to summary judgment, the burden then shifts to the nonmovant to raise a genuine issue of material fact. *See Katy Venture, Ltd. v. Cremona Bistro Corp.*, 469 S.W.3d 160, 163 (Tex. 2015) (per curiam); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex.

2014) ("[I]f the movant does not satisfy its initial burden, the burden does not shift and the non-movant need not respond or present any evidence.").

A party may also, after adequate time for discovery, move for no-evidence summary judgment on the ground that no evidence exists of one or more essential elements of a claim on which the adverse party bears the burden of proof at trial. TEX. R. CIV. P. 166a(i). The burden then shifts to the nonmovant to produce evidence raising a genuine issue of material fact on the elements specified in the motion. *Id.*; *Mack Trucks, Inc v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The trial court must grant the motion unless the nonmovant produces summary judgment evidence raising a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i).

We review the evidence presented in the motion and response in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Helix Energy Sols. Grp., Inc. v. Gold*, 522 S.W.3d 427, 431 (Tex. 2017).

Turner moved for traditional and no-evidence summary judgment. As to the appellants' premises-liability claim, Turner admitted that Leyva was an invitee but

asserted that there was no evidence that Turner failed to warn or make safe a condition that Turner knew or should have known of and that caused an unreasonable risk of harm. Turner also sought summary judgment because the risk of harm while working in a tree is "open and obvious" and therefore the risk of harm is not unreasonable.

Turner moved for summary judgment on appellants' negligence claim, asserting that there was no evidence that he owed Leyva a duty, that he breached a duty, or that any breach caused the appellants' injuries.[1]

Appellants contend in part in their first issue that there are fact issues on whether Turner had knowledge of the dangerous conduct on his premises and whether Turner exercised control over Leyva and Zamora's work. In their second issue, appellants assert that there is a fact issue on whether Turner knew or should have known of the dangerous condition. We begin with appellants' second issue.

### Premises liability

Generally, a premises owner has a duty to protect invitees from, or warn them of, conditions posing unreasonable risks of harm if the owner knew of the conditions or, in the exercise of reasonable care, should have known of them.

---

[1]     Turner also moved for summary judgment on the ground that he owed no duty to Leyva, an independent contractor, under Chapter 95 of the Civil Practice and Remedies Code. Turner concedes on appeal that Chapter 95 is inapplicable. Therefore, appellants' third issue, which addresses Chapter 95, is moot.

*Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014) (per curiam) (citing *TXI*

*Operations, L.P. v. Perry*, 278 S.W.3d 763, 764–65 (Tex. 2009)).

The elements of an invitee's premises-liability claim are:

(1) the plaintiff was an invitee;

(2) the defendant was a possessor of the premises;

(3) a condition of the premises created an unreasonable risk of harm to the plaintiff;

(4) the defendant knew or reasonably should have known of the condition (actual or constructive knowledge);

(5) the defendant failed to exercise ordinary care to protect the invitee from danger by failing to adequately warn the plaintiff of the condition or by failing to make the condition reasonably safe; and

(6) the defendant's failure was a proximate cause of injury to the plaintiff.

*See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010); *LMB, Ltd.*

*v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006); *Seideneck v. Cal Bayreuther*

*Assocs.*, 451 S.W.2d 752, 753–54 (Tex. 1970); *see also Henkel*, 441 S.W.3d at

251–52 (citing *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000)). An

owner or occupier of a premises does not owe an invitee the duty of an insurer.

*CMH Homes*, 15 S.W.3d at 101.

The threshold issue in a premises-liability claim is whether the defendant

had actual or constructive knowledge of the allegedly dangerous condition. *Hall v.*

*Sonic Drive–In of Angleton, Inc.*, 177 S.W.3d 636, 644 (Tex. App.—Houston [1st

11

Dist.] 2005, pet. denied). "Ordinarily, an unreasonably dangerous condition for which a premises owner may be liable is the condition at the time and place injury occurs, not some antecedent situation that produced the condition." *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 407 (Tex. 2006). The duty owed to an invitee in a premises-liability case "depends on actual or constructive knowledge of a dangerous condition that a reasonable inspection would reveal," and as such, "an owner or occupier is not liable for deterioration of its premises unless it knew of or by reasonable inspection would have discovered the deterioration." *CMH Homes*, 15 S.W.3d at 101.

The Texas Supreme Court has noted that "there is no one test for determining actual knowledge that a condition presents an unreasonable risk of harm," but courts "generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition." *Univ. of Tex.–Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008) (per curiam). The "actual knowledge" required for premises liability "is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time." *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006) (per curiam). "Awareness of a potential problem is not actual knowledge of an existing danger." *City of Denton v. Paper*, 376 S.W.3d 762, 767 (Tex. 2012) (quoting *Reyes v. City of Laredo*, 335 S.W.3d 605, 609 (Tex.

12

2010)). Furthermore, "[c]onstructive knowledge is a substitute in the law for actual knowledge." *CMH Homes*, 15 S.W.3d at 102.

Constructive knowledge is "what a person after a reasonable inspection ought to know or have reason to know." *Duncan v. First Tex. Homes*, 464 S.W.3d 8, 16 (Tex. App.—Fort Worth 2015, pet. denied). Constructive knowledge can be established by evidence that it is more likely than not that the dangerous condition had existed long enough to give the premises owner a reasonable opportunity to discover it. *Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002); *Bendigo v. City of Houston*, 178 S.W.3d 112, 114 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Temporal evidence, or evidence of the length of time the dangerous condition existed, is the best indication of whether the premises owner had a reasonable opportunity to discover and remedy the situation. *Reece*, 81 S.W.3d at 816.

We recently noted the following:

"'The inviter . . . will not be held liable for defects which would not have been disclosed by a reasonably careful inspection, even though no such inspection has been made.'" *Kansas City So. R.R. v. Guillory*, 376 S.W.2d 72, 76 (Tex. Civ. App.—Beaumont 1964, writ ref'd n.r.e.) (quoting 65 C.J.S. *Negligence* § 51).

Because the core of the duty [to an invitee] depends on actual or constructive knowledge of a dangerous condition that a reasonable inspection would reveal, it follows that an owner or occupier is not liable for deterioration of its premises unless it knew of or by reasonable inspection would have discovered the deterioration.

> Many building materials will, over time, deteriorate and require repair or replacement. That does not necessarily mean that the owner or occupier has created a dangerous condition or that the owner has actual or constructive knowledge of a dangerous condition.

*Daenen*, 15 S.W.3d at 101 (citations omitted).

*Carter v. Tarantino Props., Inc.*, No. 01-17-00843-CV, 2019 WL 346895, at \*2–3 (Tex. App.—Houston [1st Dist.] Jan. 29, 2019, no pet.) (mem. op.).

The undisputed summary judgment evidence reflects that Leyva fell and died because a branch broke while he was removing Christmas lights. The only evidence of what caused the branch to break is Zamora's opinion that it "possibly" broke because a recent freeze may have caused the branch to die. Zamora also testified that the branch was not dead when they installed the lights in late November of 2016—it was "in good condition" or it would have broken then.

Assuming that the branch had died because of the recent freeze, there is no evidence that Turner had actual knowledge of the allegedly dangerous condition— that the branch was dead and could break—at the time of Leyva's accident. There is no evidence that Turner had constructive knowledge that the branch was dead and could break or that a reasonable inspection would have discovered the allegedly dangerous condition. The only evidence pertaining to constructive knowledge is Zamora's testimony that, because the tree lost its leaves in the winter, he could not know if the branch was dead and did not think it was dead. He said

14

that there was no way to know whether the branch was dead, further stating, "I think nobody could have known." Zamora agreed that there was no way to tell if a branch is dead until weight was put on it and it broke. We therefore hold that there is no evidence that Turner knew or should have known of the allegedly dangerous condition.[2] The trial court did not err in granting summary judgment on appellants' premises liability claim. We overrule issue two.

### *Negligence*

Depending on the circumstances, a person injured on another's property may have either a negligence claim or a premises-liability claim against the property owner. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016). If the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. *Id.*; *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) ("Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity."). If the injury is the result of the property's condition, rather than an activity, premises-liability principles apply. *Jenkins*, 478 S.W.3d at 644.

---

[2]     On the record before us, we decline to hold that Turner had a duty to perform a reasonable inspection of his trees before Zamora and Leyva removed the lights. Moreover, appellants do not point to any Texas authority imposing such a duty on premises owners.

Negligent activity claims "encompass[] a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury," but premises liability claims "encompass[] a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Del Lago*, 307 S.W.3d at 776. Negligence and premises-liability claims are based on independent theories of recovery, and they are not interchangeable. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). The supreme court has explained:

> Negligent-activity and premises liability claims "involve closely related but distinct duty analyses." *W. Invs., Inc. v. Urena*, 162 S.W.3d 547 550 (Tex. 2005). In a negligent-activity case, a property owner or occupier must "do what a person of ordinary prudence in the same or similar circumstances would have . . . done," whereas a property owner or occupier in a premises liability case must "use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (alteration in original) (citations and internal quotation marks omitted); *see also TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 765 (Tex. 2009) ("[A] premises owner or occupier must either adequately warn of the dangerous condition or make the condition reasonably safe.").

*Id.*

Appellants' negligence claim includes an allegation that Turner failed to warn Leyva of the dangerous condition on the property. Because this specific negligence allegation is based on the allegedly dangerous condition of the

16

property, appellants are limited to their premises-liability theory of recovery.[3] *See id.* at 471–72; *Jenkins*, 478 S.W.3d at 644; *see also Parrish v. SMG*, No. 01-16-00934-CV, 2017 WL 6043536, at \*6 (Tex. App.—Houston [1st Dist.] Dec. 7, 2017, no pet.) (mem. op.) ("This is a claim based on the allegedly unsafe and dangerous condition of the property. We therefore apply premises-liability principles to Parrish's claim, and not principles of ordinary negligence.") (citations omitted); *E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 57 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd) ("Because Roye's claim is based on an unsafe or dangerous condition of the property, we hold that [he is limited] to a premises liability theory of recovery."). Turner therefore owed no duty to warn Leyva under this negligence theory, and the trial court properly granted Turner's no-evidence motion for summary judgment.

Appellants' other negligence allegation is that Turner directed Leyva to perform work in a dangerous manner without regard to his safety. Liability for a negligent-activity theory "requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Oncor Elec. Delivery Co. v. Murillo*, 449 S.W.3d 583, 591–92 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (quoting *Keetch*, 845 S.W.2d at 264).

---

[3] If appellants could assert such a negligence claim, it would fail for the reason we held that appellants' premises-liability claim fails—there is no evidence that Turner knew or should have known of the allegedly dangerous condition, thus obviating any duty to warn.

It is undisputed that Turner was not present when Leyva was removing the lights and did not know that Leyva and Zamora were on his premises. Assuming without deciding that Turner owed any duty to Leyva, there is no evidence that Turner was engaged in any contemporary activity—negligent or otherwise—when Leyva fell from the tree. *See Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 910 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The trial court therefore properly granted Turner's no-evidence motion for summary judgment on this negligence allegation.

We overrule appellants' first issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.